Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000085
29-JUN-2018
02:09 PM

NOS. CAAP-17-0000085 and CAAP-17-0000086

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

IN THE INTEREST OF HK

APPEAL FROM THE FAMILY COURT OF THE FIRST CIRCUIT
(FC-S NO. 12-00193)

SUMMARY DISPOSITION ORDER
(By: Ginoza, Chief Judge, Fujise and Leonard, JJ.)

In these consolidated cases,[1] Appellant Father (Father) and Appellant Mother (Mother) appeal from the Order Terminating Parental Rights, entered on February 6, 2017, in the Family Court of the First Circuit (Family Court),[2] which terminated Father's and Mother's parental rights to their child, HK.

On appeal, Father challenges Findings of Fact (FOF) Nos. 11, 13, 59, 63, 79, 80, 81, 89 to 99, 101, and 106 through 110. Father contends the Family Court erred by (1) finding there was clear and convincing evidence that Mother and Father were not willing and able to provide a safe family home, and they would not become willing and able to provide a safe family home within a reasonable period of time, even with the assistance of a service plan, (2) finding Petitioner-Appellee State of Hawai'i, Department of Human Services (DHS or State) made reasonable efforts to reunify Mother and Father with HK, and that parents were given a reasonable opportunity to succeed in remedying their

_____

[1] By order dated August 4, 2017, this court ordered the consolidation of Father's appeal in CAAP-17-0000085 with Mother's appeal in CAAP-17-0000086.

[2] The Honorable Steven M. Nakashima presided.

issues, (3) admitting State's Exhibit 58 into evidence without proper notice to Mother and Father, in violation of their right to a fair hearing, (4) ordering a psychologist and HK's therapist to assess Mother's and Father's ability to independently care for HK and HK's sibling, PK, after trial had commenced, in violation of Father's right to a fair hearing, (5) finding DHS did not abuse its discretion by placing HK with maternal Aunt and Uncle, as resource caregivers, and promising they could adopt HK, and (6) finding the permanent plan goal of adoption was in HK's best interest.

In her appeal, Mother challenges FOF Nos. 44, 45, 54, 55, 57, 58, 60, 94, 95, and 105 through 110, and Conclusions of Law (COL) Nos. 8 through 11. Mother contends the Family Court erred by (A) finding she is unwilling and unable to provide a safe family home within a reasonable period of time, even with the assistance of a service plan, (B) failing to order DHS to continue to provide reasonable services to address problems that stood in the way of reunification, (C) basing its decision to terminate Mother's parental rights on threatened harm from removing HK from placement that she had been in her entire life, (D) finding HK's current situation was a significant factor in FOF No. 45 (i) to (vii), (E) considering HK's wishes in selecting her placement, (F) considering the resource caregivers' ability to provide material comfort and economic consideration, and (G) failing to consider how various orders delaying the trial, trial duration, and delay in ruling on her Motion for Immediate Review, impacted its conclusion that Mother would not become willing and able to provide a safe family home within a reasonable period of time, even with the assistance of a service plan.

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Father's and Mother's points of error as follows and affirm.

2

> [T]he family court's determinations pursuant to [Hawaii Revised Statutes (HRS)] § 587-73(a) with respect to (1) whether a child's parent is willing and able to provide a safe family home for the child and (2) whether it is reasonably foreseeable that a child's parent will become willing and able to provide a safe family home within a reasonable period of time present mixed questions of law and fact; thus, inasmuch as the family court's determinations in this regard are dependant upon the facts and circumstances of each case, they are reviewed on appeal under the "clearly erroneous" standard. Likewise, the family court's determination of what is or is not in a child's best interests is reviewed on appeal for clear error.
>
> Moreover, the family court is given much leeway in its examination of the reports concerning a child's care, custody, and welfare, and its conclusions in this regard, if supported by the record and not clearly erroneous, must stand on appeal.

In re Doe, 95 Hawai'i 183, 190, 20 P.3d 616, 623 (2001) (citations, internal quotation marks, and brackets omitted). Thus, in appeals concerning family court decisions to terminate parental rights pursuant to HRS § 587-73(a),

> the question on appeal is whether the record contains substantial evidence supporting the family court's determinations, and appellate review is thereby limited to assessing whether those determinations are supported by credible evidence of sufficient quality and probative value. In this regard, the testimony of a single witness, if found by the trier of fact to have been credible, will suffice.

Id. at 196, 20 P.3d at 629 (citations and internal quotation marks omitted).

Additionally, the family court

> possesses wide discretion in making its decisions and those decisions will not be set aside unless there is a manifest abuse of discretion. Under the abuse of discretion standard of review, the family court's decision will not be disturbed unless the family court disregarded rules or principles of law or practice to the substantial detriment of a party litigant and its decision clearly exceeded the bounds of reason.

In re Doe, 77 Hawai'i 109, 115, 883 P.2d 30, 36 (1994) (citations, internal quotation marks, brackets, and ellipsis omitted).

With respect to Father's appeal:[3]

(1) The Family Court did not err by finding there was clear and convincing evidence that Father was not willing and

---

[3] Father lacks standing to enforce Mother's parental rights. In the Interest of F Children, 120 Hawai'i 398, 207 P.3d 148, Nos. 28882, 28883, and 28884, 2009 WL 1300933 (App. May 8, 2009) (mem) at *8 (citing In re D.S., 156 Cal. App. 4th 671, 673-74, 67 Cal. Rptr. 3d 450, 451 (2007)). Therefore, any claim or argument that pertains to Mother's parental rights in Father's appeal will not be considered.

able, and it was not reasonably foreseeable that he would become willing and able, to provide a safe family home for HK, even with the assistance of a service plan within a reasonable period of time, not to exceed two years from HK's entry into foster care. HRS § 587A-33 (Supp. 2017).[4]

The Family Court must consider the factors stated in HRS § 587A-7 (Supp. 2017)[5] in determining whether a child's

---

[4]    HRS § 587A-33 states in pertinent part:

> **§587A-33  Termination of parental rights hearing.**
> (a) At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:
>
> > (1)    A child's parent whose rights are subject to termination is not presently willing and able to provide the parent's child with a safe family home, even with the assistance of a service plan;
> >
> > (2)    It is not reasonably foreseeable that the child's parent whose rights are subject to termination will become willing and able to provide the child with a safe family home, even with the assistance of a service plan, within a reasonable period of time, which shall not exceed two years from the child's date of entry into foster care;
> >
> > (3)    The proposed permanent plan is in the best interests of the child.  In reaching this determination, the court shall:
> >
> > > (A)    Presume that it is in the best interests of the child to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home; and
> > >
> > > (B)    Give greater weight to the presumption that the permanent plan is in the child's best interest, the younger the child is upon the child's date of entry into foster care[.]

[5]    HRS § 587A-7 states:

> Safe family home factors.  (a) The following factors shall be fully considered when determining whether a child's family is willing and able to provide the child with a safe family home:
>
> > (1)    Facts relating to the child's current situation, which shall include:
> >
> > > (A)    The child's age, vulnerability, and special needs that affect the child's attachment, growth, and development;

(continued...)

[5](...continued)

    (B)    The child's developmental, psychological, medical, and dental health status and needs, including the names of assessment and treatment providers;

    (C)    The child's peer and family relationships and bonding abilities;

    (D)    The child's educational status and setting, and the department's efforts to maintain educational stability for the child in out-of-home placement;

    (E)    The child's living situation;

    (F)    The child's fear of being in the family home;

    (G)    The impact of out-of-home placement on the child;

    (H)    Services provided to the child and family; and

    (I)    The department's efforts to maintain connections between the child and the child's siblings, if they are living in different homes;

(2)    The initial and any subsequent reports of harm and threatened harm to the child;

(3)    Dates and reasons for the child's out-of-home placement; description, appropriateness, and location of the placement; and who has placement responsibility;

(4)    Facts regarding the alleged perpetrators of harm to the child, the child's parents, and other family members who are parties to the court proceedings, which facts shall include:

    (A)    Birthplace and family of origin;

    (B)    Manner in which the alleged perpetrator of harm was parented;

    (C)    Marital and relationship history; and

    (D)    Prior involvement in services;

(5)    Results of psychiatric, psychological, or developmental evaluations of the child, the alleged perpetrators, and other family members who are parties;

(6)    Whether there is a history of abusive or assaultive conduct by the child's family members and others who have access to the family home;

(7)    Whether there is a history of substance abuse by the child's family or others who have access to the family home;

(continued...)

family is willing and able to provide a safe family home.

HK was born on August 5, 2012, while Mother was incarcerated in the Women's Community Correctional Center. On October 6, 2012, HK entered foster care when she was two months old. FOF No. 49. After Mother initially refused to disclose Father's name, she indicated she had concerns about his ability to care for HK because he was caring for their other young child, PK, who was three years old at the time, and his teenage child from a prior relationship. FOF Nos. 10 and 26. On February 28, 2013, the Family Court ordered Mother and Father to follow a service plan, dated October 22, 2012 (October 2012 Service Plan). The October 2012 Service Plan required Father to submit to random drug testing, participate in home based services to

---

5(...continued)

(8)     Whether any alleged perpetrator has completed services in relation to any history identified in paragraphs (6) and (7), and acknowledged and accepted responsibility for the harm to the child;

(9)     Whether any non-perpetrator who resides in the family home has demonstrated an ability to protect the child from further harm and to ensure that any current protective orders are enforced;

(10)    Whether there is a support system available to the child's family, including adoptive and hanai relatives, friends, and faith-based or other community networks;

(11)    Attempts to locate and involve extended family, friends, and faith-based or other community networks;

(12)    Whether the child's family has demonstrated an understanding of and involvement in services that have been recommended by the department or court-ordered as necessary to provide a safe family home for the child;

(13)    Whether the child's family has resolved identified safety issues in the family home within a reasonable period of time; and

(14)    The department's assessment, which shall include the demonstrated ability of the child's family to provide a safe family home for the child, and recommendations.

(b)     The court shall consider the likelihood that the current situation presented in the safe family home factors set forth in subsection (a) will continue in the reasonably foreseeable future.

6

address parenting two children under the age of two, and participate in individual counseling. A DHS Safe Family Home Report, dated April 2, 2013, stated Father sometimes had difficulty when visiting with HK while simultaneously caring for his two-year-old daughter. DHS's safety concern with Father was that he needed to engage in hands-on parenting for two children less than two years of age and a teenaged daughter.

After placement with maternal Aunt and Uncle in April 2013, Father stated he did not want any more visits with HK.

Prior to September 2015, Father had resumed visits with HK. Father informed a social worker that he did not think he would be able to care for HK and her siblings, and he wanted maternal Aunt and Uncle to adopt HK. On October 30, 2013, DHS filed a Motion to Terminate Parental Rights. The Family Court defaulted Father for failing to appear at hearings from January 2014 to June 2014.

Leimomi Brigoli (Brigoli), a DHS social worker, testified that her safety concern with Father was his ability to care for HK because he was stressed about his teenage daughter's needs and involvement with juvenile court. In her opinion, Father was not willing and able to provide HK with a safe family home because he was occupied with his teenaged daughter. Brigoli also stated Father has a hard time setting boundaries and enforcing rules for the children. Brigoli testified it is not reasonably foreseeable that Father will become willing and able to provide HK with a safe family home, even with the assistance of a service plan, within a reasonable period of time, because HK had been in foster care for three years and Father had failed to engage in services and provide a safe home during that time.

To address DHS's safety concern, the Family Court ordered Dr. Rebecca Getschmann-Padua (Dr. Getschmann-Padua), a psychologist, and Karin Watanabe Choi (Watanabe Choi), a licensed clinical social worker and private therapist, to assess the parents' abilities to independently care for both HK and PK simultaneously. Dr. Getschmann-Padua testified that Father was unable to parent two children because he struggles parenting one child, and she would not recommend he babysit both children while

7

Mother was at work. She stated that Father could care for either HK or PK.

Watanabe Choi testified that Father recognized and attended to HK's needs, but it would be very difficult for Father to parent both children because PK does not listen to him and HK is very reluctant to receive comfort from him.

Therefore, there was clear and convincing evidence that Father was not willing and able to provide a safe family home, and it was not reasonably foreseeable that he would become willing and able to do so within a reasonable period of time, even with the assistance of a service plan.

Father also claims the Family Court gave undue weight to HK's attachment to her resource caregivers, maternal Aunt and Uncle, and erroneously considered it dispositive in determining Mother and Father could not provide a safe family home. Contrary to Father's claim, that was not the sole factor under HRS § 587A-7 that the Family Court considered significant. The Family Court also found Mother was unable to care for HK while she was incarcerated and she did not believe Father could care for HK while he also cared for PK and his teenage daughter, HK had been placed with maternal Aunt and Uncle since she was eight months old and remained with them for approximately three years and ten months, HK identified maternal Aunt and Uncle as her mother and father, and HK identified Mother and Father more like an aunt and uncle. The Family Court found these facts collectively significant when it considered the safe family home factors under HRS § 587A-7(a)(1). The Family Court considered "the other two to fourteen factors" in making its decision, though it did not refer to them in its oral decision to terminate parental rights. The Family Court also referenced specific factors as significant in FOF No. 45(d). Therefore, Father's claim that the Family Court used the factor of HK's attachment as the sole factor or gave it undue weight when determining whether Mother and Father could provide a safe family home is without merit.

(2) The Family Court did not err by finding DHS made reasonable efforts to reunify Father with HK. Father contends DHS failed to provide him with an opportunity to demonstrate his abilities, he was waitlisted for services, DHS did not clearly explain what he needed to do to reunify with HK and kept changing the plan when a new social worker was assigned to the case, and DHS thwarted reunification by allowing only supervised visits, denying increased visits, and denying a transition plan.

Father acknowledges there was only one service plan. Thus, his claim that the plan kept changing lacks merit. The October 2012 Service Plan stated that Father's home-based services were to address parenting two children under the age of two. It plainly stated its purpose and expectations of Father to address DHS's safety concern by demonstrating he could parent two young children.

During a December 30, 2014 hearing, the parties agreed DHS would give the parents more time to do services to achieve reunification because they were on a waiting list for services with Catholic Charities, and it was not Father's fault that they were on a waiting list. The Family Court then rescheduled trial for April 23, 2015. Therefore, Father was afforded additional time to complete services and the delay due to being on a waiting list was not held against him.

Father does not identify where in the record he requested increased visits or unsupervised visits with HK, DHS denied his request for increased visits, or DHS denied a transition plan proposed by him prior to trial. Therefore, these points of error are waived. Rule 28(b)(4) of the Hawai'i Rules of Appellate Procedure (HRAP). Regardless, Watanabe Choi recommended no change in visitation because DHS had not yet approved unsupervised visits and HK's anxiety was too high to alter the visitation schedule.

The Family Court initially scheduled trial for February 13, 2014 but rescheduled it several times until trial began on February 9, 2016. Father re-engaged in services in May 2014 when Mother was released from prison. After Father completed his recommended services, Dr. Getschmann-Padua and

9

Watanabe Choi assessed Father's ability to care for his children and separately concluded that he could not do so after nearly three and a half years since HK entered foster care. Therefore, Father had ample time to complete services and demonstrate his ability to parent two young children to reunify with HK.

(3) The Family Court did not err by admitting State's Exhibit 58, a February 8, 2016 letter from Watanabe Choi to Debra Yoshizumi (Yoshizumi), a DHS social worker, during trial on February 9, 2016. State's Exhibit 58 contained Watanabe Choi's response to an inquiry by Yoshimuzi regarding HK. Father claims it was unfair and prejudicial to admit the exhibit because he "did not have a chance to review the document and did not have a chance to consult with counsel nor adequately prepare trial questions for the witness that was testifying shortly thereafter, as it may have related to the evidence accepted by the Court."

DHS shall file written reports with the court:

> No less than fifteen days before a scheduled return hearing, periodic review hearing, permanency hearing, or termination of parental rights hearing; provided that additional information may be submitted to the court up to the date of the hearing; <u>provided that the department or other authorized agencies make a good cause showing that such additional information was not available to the department or other authorized agency before the fifteen day deadline</u>.

HRS § 587A-18(2) (Supp. 2017) (emphasis added). Watanabe Choi's February 8, 2016 letter was not available to DHS fifteen days before trial began on February 9, 2016. The information in the letter pertained to HK and was a direct result of an inquiry by DHS regarding HK  Therefore, the Family Court did not err in admitting State's Exhibit 58 into evidence.

In addition, the admission did not prejudice Father. Only Brigoli testified on February 9, 2016, and she did not testify about the letter. On August 25, 2016, more than six months after the Family Court admitted the letter into evidence, Watanabe Choi testified during trial and Father's counsel cross-examined her about the letter. On November 16, 2016, Yoshizumi testified but Father's counsel elected not to question her about

10

the letter. Therefore, even if admission of State's Exhibit 58 was untimely, Father was not prejudiced by its admission.

(4) Father contends the Family Court erred by ordering Dr. Getschmann-Padua and Watanabe Choi to perform an assessment of Father's parenting ability after trial commenced. Father claims it was not harmless error because it directly affected his right to a fair hearing as the Family Court relied upon the assessment to terminate his parental rights.

During a December 17, 2015 hearing, DHS stated that Watanabe Choi was assessing Mother's ability to parent both children simultaneously. Mother's counsel requested that Dr. Getschmann-Padua also assess HK's relationship with Mother and PK. Father's counsel expressly did not take a position on the issue. The Family Court did not decide Mother's request during the December 17, 2015 hearing.

When trial commenced on February 9, 2016, neither Dr. Getschmann-Padua nor Watanabe Choi had conducted an assessment. Mother's counsel again requested that Dr. Getschmann-Padua make an assessment. The Family Court did not want to proceed without assessments as to both Mother and Father and wanted to give Watanabe Choi and Dr. Getschmann-Padua sufficient time to make their assessments. Neither Mother nor Father objected when the Family Court ordered Dr. Getschmann-Padua and Watanabe Choi to perform their assessments and rescheduled the continued trial to June 2016. Therefore, Father's point of error is waived. HRAP Rule 28(b)(4).

(5) Father contends the Family Court erred by finding DHS did not abuse its discretion by placing HK with a maternal Aunt and Uncle, as resource caregivers, or that DHS did not promise maternal Aunt and Uncle that they could adopt HK. Father did not point to where in the record he objected to HK's placement with maternal Aunt and Uncle. Thus, this claim is also waived. HRAP Rule 28(b)(4).

The evidence supports a finding that DHS did not promise maternal Aunt and Uncle that they could adopt HK.

Brigoli stated adoption was not discussed until sometime after placement with the maternal Aunt and Uncle. Maternal Uncle stated that Brigoli brought up adoption of HK when they were trying to become resource caregivers and Father asked maternal Aunt and Uncle to adopt HK.

(6) Father claims the permanent plan goal of adoption was not in HK's best interest and the goal should have been legal guardianship so the parents could maintain visitation.

HRS § 587A-32 (Supp. 2017) states in part:

§587A-32 Permanent plan. (a) The permanent plan shall:

(1) State whether the permanency goal for the child will be achieved through adoption, legal guardianship, or permanent custody;

(2) Establish a reasonable period of time by which the adoption or legal guardianship shall be finalized;

(3) Document:

(A) A compelling reason why legal guardianship or permanent custody is in the child's best interests if adoption is not the goal; or

(B) A compelling reason why permanent custody is in the child's best interests if adoption or legal guardianship is not the goal[.]

HRS § 587A-33 (Supp. 2017) states in part:

§587A-33 Termination of parental rights hearing. (a) At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that:

. . . .

(3) The proposed permanent plan is in the best interests of the child. In reaching this determination, the court shall:

(A) Presume that it is in the best interests of the child to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home; and

(B) Give greater weight to the presumption that the permanent plan is in the child's best interest, the younger the child is upon the child's date of entry into foster care[.]

HK was approximately two days old when she entered temporary foster custody because she was born while Mother was incarcerated in August 2012. FOF Nos. 48 and 51. HK entered foster custody on October 6, 2012. FOF No. 49. Under HRS § 587A-33(a)(3)(B), given HK's young age upon entry into foster care, greater weight is given to the presumption that the permanent plan goal of adoption is in HK's best interest.

Father cites no evidence to support his claim that legal guardianship with visitation rather than termination of parental rights is in HK's best interest. Instead, Father cites the Family Court's statement that when placing HK for adoption, DHS should include the possibility of requiring maternal Aunt and Uncle to enable Mother and Father to remain in HK's life. Father also relies upon the Order Terminating Parental Rights which states, "DHS shall make best efforts to ensure that parents continue to remain in [HK's] life, including the possibility of conditioning the placement of [HK] on maintaining contact between parents and [HK][.]" The Family Court did not state that adoption was not in HK's best interest. To the contrary, the Family Court expressly found adoption was in HK's best interest, and it would also be in HK's best interest if adoption could possibly include Mother and Father somehow remaining in HK's life. Whether Mother and Father ultimately are able to maintain contact with HK after adoption does not rebut the presumption that the permanent plan's goal of adoption is in HK's best interest. Therefore, Father's argument fails.

With respect to Mother's appeal:

(A) The Family Court did not err by finding there was clear and convincing evidence that Mother was not willing and able to provide a safe family home, even with the assistance of a service plan. Mother contends

> DHS did not present any evidence of whether [Mother] cannot adequately and safely care for HK and [PK] at the same time, nor did the Court have such evidence to consider, and seems to not need such evidence by focusing almost solely on where the subject child had resided for all of her life.

Brigoli testified Mother was involved with DHS in prior child protective cases due to Mother's substance abuse. Mother has five older children besides HK. FOF 66. Mother did not raise her four oldest children; her parental rights to two of them have been terminated. Id. Mother had completed substance abuse treatment in the past but relapsed. Mother has mental health problems, including ADHD, FOF 71, and a neuropsychiatric evaluation conducted in 2000 indicated that Mother has a deficit in the left frontal lobe of her brain as a result of her long-term use of crystal methamphetamines.

DHS's safety concern was Mother's ability to care for both HK and PK, simultaneously, based on Dr. Getschmann-Padua reporting PK was a "handful" to care for, PK had her own health issues, and Mother might have difficulty meeting both children's needs. Brigoli stated Mother did well in programs but once she comes out she has historically declined and could relapse again, which would place HK at further risk of harm. In her opinion, Mother was willing but not able to provide a safe family home for HK, even with the assistance of a service plan, because she was working through her own issues and her relationship with PK. Brigoli believed it was not reasonably foreseeable that Mother would become willing and able to provide HK with a safe family home, even with the assistance of a service plan, within a reasonable period of time, because Mother had sufficient time to gain stability for herself and PK to reunify with HK.

On September 8, 2015, the Family Court continued the trial to February 9, 2016, and at DHS's request, ordered Mother to leave transitional housing as soon as possible to demonstrate her willingness and ability to provide a safe family home without assistance. In May 2016, about three months after trial began, Mother moved to her own apartment.

Dr. Getschmann-Padua testified that based on her assessment, she believed Mother could parent both children. Watanabe Choi testified that, based upon her observations, Mother did not consistently recognize when HK becomes disregulated, which is difficulty coping or staying calm. She also stated Mother sometimes did not recognize and attend to HK's needs and

14

HK was not bonded with Mother. Watanabe Choi observed PK playing roughly with HK but Mother was not always able to address the situation.

The Family Court found both Watanabe Choi and Dr. Getschmann-Padua credible, but noted that Dr. Getschmann-Padua based her assessment on her limited knowledge of HK from only 12 therapy sessions, whereas Watanabe Choi had worked with HK weekly since December 2015, and Dr. Getschmann-Padua's opinion was based in part on her belief that an adopted child will have a "hole" in her heart and will want to fill that void by eventually returning to the biological parent. FOF Nos. 114 and 115. Ultimately the Family Court credited Watanabe Choi's opinion over Dr. Getschmann-Padua's. "[A]n appellate court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence; this is the province of the trier of fact." Fisher v. Fisher, 111 Hawai'i 41, 46, 137 P.3d 355, 360 (2006) (citation and internal quotation marks omitted).

Therefore, DHS presented substantial evidence that Mother could not adequately and safely care for both children at the same time.

(B) Mother contends DHS failed to provide a reasonable opportunity to reunite with HK because she was ordered to leave transitional housing and was not provided expanded visits. Mother fails to demonstrate where in the record she objected to the Family Court's September 8, 2015 order that she leave transitional housing. Mother's reliance upon her Exhibits B, C, H, O, Q, and R to support her claim that the Family Court should have authorized expanded visits is misplaced because those exhibits were not provided to the Family Court until they were entered into evidence by Mother at the continued trial on June 30, 2016. Therefore, those exhibits were not a basis to support expanded visits before June 30, 2016. As explained below, the Family Court acted reasonably by delaying its ruling on Mother's Motion for Immediate Review, which requested unsupervised and overnight visits, until it received all evidence concerning Mother's ability to care for two children simultaneously.

15

Mother further argues DHS did not intend to reunify HK with her by pointing to Yoshizumi's November 16, 2016 testimony that DHS did not expand visits because it did not want to make too many changes, and was in permanency mode. However, Yoshizumi explained that reunification efforts do not stop when DHS is in permanency mode, visits would end entirely if no effort to reunify was being made, and visits with HK were continuing. Accordingly, this point of error lacks merit.

(C) Contrary to Mother's claim, the Family Court did not terminate her parental rights based on the threatened harm of removing HK from placement with her resource caregivers. In the Petition for Foster Custody, filed on October 26, 2012, DHS identified HK as being subject to neglect because Mother was incarcerated and was unable to provide HK's immediate needs of food, clothing, shelter, and medical care. DHS also noted Mother's loss of parental rights to five out of six children, and prior drug or alcohol abuse. In deciding whether to terminate parental rights, the Family Court must determine by clear and convincing evidence that a parent is willing and able to provide a safe family home. HRS § 587A-33(a)(1). When determining whether a family is willing and able to provide a child with a safe family home, the Family Court must consider the factors stated in HRS § 587A-7(a)(1), which includes the child's "family relationships and bonding abilities," and "[t]he child's living situation." The Family Court's findings of fact are reviewed under the clearly erroneous standard and conclusions are reviewed de novo under the right/wrong standard. In re Doe, 95 Hawai'i at 190, 20 P.3d at 623. It was not erroneous for the Family Court to consider HK's removal from her placement in which she formed an attachment to her resource caregivers, pursuant to HRS § 587A-7(a)(1). The factors in HRS § 587A-7(a)(1) are not obstacles to reunification, they are the factors used to evaluate whether a child's family is willing and able to provide a safe family home.

(D) The Family Court did not err by finding HK's living conditions were a significant factor in FOF No. 45. Dr. Getschmann-Padua testified HK had trouble bonding with everyone and had only superficial bonding because she runs from

person to person, wanting to be with them and then not wanting to be with them. Watanabe Choi testified that she did not believe that HK was bonded to Mother or Father because HK would not regularly accept comfort and soothing from them. Instead, Watanabe Choi believed HK was bonded to the resource caregivers because she accepted comfort from them, was confident while resource caregivers are present, demonstrated feeling safe with the resource caregivers and otherwise did not have attachment or bonding issues. The Family Court credited Watanabe Choi's opinion over Dr. Getschmann-Padua's and this court will not pass upon issues dependent upon the credibility of witnesses and the weight of the evidence. Fisher, 111 Hawai'i at 46, 137 P.3d at 360.

(E) The Family Court did not consider HK's wishes in selecting her placement. Mother claims FOF No. 58, which states HK "has been consistent in expressing her desire to remain with her current resource caregivers," demonstrates the Family Court considered the preference of a four-year-old child in choosing her living situation. Mother also relies upon State's Exhibit 58, in which Watanabe Choi stated Yoshizumi wanted to know what HK wants.

Contrary to Mother's claim, in State's Exhibit 58, with regard to Yoshizumi's question of what HK wants, Watanabe Choi stated various therapy activities were designed to solicit information about whom HK viewed as important in her life and to identify whom HK feels is family. Thus, Yoshizumi and Watanabe Choi were not attempting to solicit HK's preference to live with Mother, Father, or resource caregivers to determine whether Mother's parental rights should be terminated or who should have custody of her. In addition, the Family Court did not cite HK's desire to remain with the resource caregivers as a safe home factor under HRS § 587A-7 when determining whether to terminate parental rights.

(F) Mother claims the resource caregivers' jobs and financial status were considered in deciding whether to terminate her parental rights. Mother misquotes Yoshizumi's testimony by claiming she stated that resource caregivers have a "safe and

stable home with all opportunities afforded her." In this regard, Yoshizumi testified the permanent plan would provide HK "a safe and stable home with parents that can provide anything and all the opportunities that she can--that can be afforded to her." This testimony is pertinent to "[t]he child's living situation," which is one of the factors to be considered under HRS § 587A-7(a)(1). Moreover, Yoshizumi did not compare the opportunities that Mother could provide with those the resource caregivers could provide.

Mother also faults Yoshizumi for stating the resource caregivers had "upstanding jobs." Yoshizumi testified that ordinarily DHS does not perform psychological evaluations on any resource caregivers unless there are doubts about their mental health, and DHS did not doubt the resource caregivers' mental health in this case because they had "upstanding jobs." The Family Court did not cite the resource caregivers' jobs as a safe home factor under HRS § 587A-7.

(G) Mother claims the Family Court erred by rescheduling trial multiple times and conducting trial over a one-year period. Mother did not point to where in the record she objected to the Family Court rescheduling trial multiple times, or hearing witness testimony over a one-year period. Therefore, these points of error are waived. HRAP Rule 28(b)(4).

Mother further contends the Family Court erred by denying her Motion for Immediate Review, filed June 15, 2016, which presented Dr. Getschmann-Padua's transition plan to allow Mother to reunify with HK by transitioning her into Mother's care immediately.[6] Mother filed her motion over four months after February 9, 2016, when Brigoli testified that Mother had yet to leave transitional housing to allow DHS to assess her ability to care for two children simultaneously and the Family Court ordered Dr. Getschmann-Padua and Watanabe Choi to assess Mother's and

---

[6]     Mother's counsel represented in her declaration in support of the motion that Dr. Getschmann-Padua had completed her assessment of Mother's parenting skills and bonding between Mother, PK and HK, that Mother was "very capable of being a parent to both," that Dr. Getschmann-Padua recommended weekly overnight visits for one month, weekend or two-night/two-day visits during the second month, complete unification "following 8 weeks of [HK's] gradual adjustment, to begin immediately."

Father's abilities to care for both children simultaneously and continued trial to June 27 and 30, 2016.

It was reasonable for the Family Court to delay ruling on the June 15, 2016 Motion for Immediate Review until both Dr. Getschmann-Padua and Watanabe Choi could complete and testify about their assessments. Dr. Getschmann-Padua testified on June 30, 2016, and Watanabe Choi testified on August 25, 2016. As stated above, Dr. Getschmann-Padua believed that Mother could parent both children at the same time upon which she based her proposing the transition plan. However, even Dr. Getschmann-Padua acknowledged Mother (1) had problems with attention and organization due to her own attention deficit disorder, for which she was under medication; (2) would need a lot of "therapeutic help and bonding" with HK; and (3) would need to give special attention to HK's need for structure due to HK's ADHD while making sure she gave equal attention to PK and PK's needs. Dr. Getschmann-Padua also conceded that the separation from her resource caregivers would be "extremely hard for" HK.

After Dr. Getschmann-Padua's testimony at the June 30, 2016 hearing, HK's guardian ad litem asked for the input from Watanabe Choi, who had already expressed in a letter that she was "not encouraging extended visits." At the August 25, 2016 hearing, Watanabe Choi testified to, among other things, HK's strong bonding with her resource caregivers and increasing separation anxiety over the course of their sessions. DHS also submitted the July 7, 2016 Multidisciplinary Team Conference Report prepared by consultants from Kapiolani Child Protection Center in which DHS, Dr. Getschmann-Padua, Watanabe Choi, the GAL and the resource caregivers participated and which concluded, that Mother's "home is unsafe for [HK] and minimally safe with services under Family Supervision for [PK]." Under the circumstances, given the conflicting information and views on Dr. Getschmann-Padua's transition proposal, reservation of ruling

until after Watanabe Choi's testimony could be heard, was not error.

Therefore, IT IS HEREBY ORDERED that the Order Terminating Parental Rights, entered on February 6, 2017, in the Family Court of the First Circuit, is affirmed.

DATED:  Honolulu, Hawai'i, June 29, 2018.

On the briefs:

Crystal M. Asano,
for Father-Appellant

Patricia A. Brady,
for Mother-Appellant.


Asami M. Williams,
Julio C. Herrera, and
Jay K. Goss,
Deputy Attorneys General,
for Petitioner-Appellees.

Chief Judge

Associate Judge

Associate Judge

20